*Verified Complaint — Abreu Santana v. Fontánez Torres et al.*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF PUERTO RICO

RECEIVED CASHIER
CLERK'S OFFICE USDC PR
2026 MAY 12 PM3:17

**AMARILYS ABREU SANTANA, Ph.D.,**

Plaintiff,

v.

Civil No. 26-cv-1286 PAD

**ERIKA FONTÁNEZ TORRES, in her official and individual capacities, as Dean of the University of Puerto Rico School of Law; VIVIAN I. NEPTUNE RIVERA, in her individual capacity; and JOHN/JANE DOES 1–20, members or former members of the UPR School of Law Faculty Admissions Committee, members or former members of the Junta de Gobierno of the University of Puerto Rico, and other UPR officials with decision-making or supervisory authority over the conduct alleged, in their individual capacities,**

RECEIPT # 123692
AMOUNT: $405.00
MAY 12 2026
CASHIER'S SIGNATURE

**Defendants.**     **JURY TRIAL DEMANDED**

---

## VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE

## RELIEF

## AND DAMAGES UNDER 42 U.S.C. § 1983

## I. NATURE OF THE ACTION

1. Plaintiff Dr. Amarilys Abreu Santana brings this civil rights action under 42 U.S.C. § 1983 to vindicate her rights under the Fourteenth Amendment to the United States Constitution. The action arises from the refusal of the University of Puerto Rico School of Law ("UPR Law") to evaluate her J.D. application under the same published criteria and through a non-coercive channel that has been afforded to other similarly situated applicants, and from a coordinated sequence of conduct that has functionally denied Plaintiff access to meaningful judicial review of that refusal.

2. Plaintiff seeks (a) prospective injunctive relief against the current Dean in her official capacity to compel evaluation of Plaintiff's application under the published non-discretionary admission formula on the basis of the data already in UPR Law's institutional possession; (b) declaratory relief; and (c) compensatory, nominal, and punitive damages against individual-capacity defendants for past constitutional deprivations.

3. Plaintiff simultaneously moves for a temporary restraining order and preliminary injunction under Federal Rule of Civil Procedure 65 to preserve the status quo and prevent imminent, structurally irreparable injury pending adjudication on the merits. The injury is not merely the loss of an entire academic year. The institutional architecture in which Defendants act — LSAC's credentialing monopoly upstream, UPR Law's status as the only public law school in the Commonwealth downstream, the same upstream LSAC monopoly applying to the two private alternatives in the Commonwealth, and the Reglamento del Tribunal Supremo de Puerto Rico, Regla 4.1.1(b), requiring a J.D. from an ABA-accredited institution as the exclusive route to the Puerto Rico bar with no alternative pathway —

eliminates every conceivable alternative pathway to legal education and to admission to the bar. The injury, absent intervention by this Court, is permanent, structural, and total.

## II. JURISDICTION AND VENUE

4. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1343(a)(3) (civil rights). Plaintiff's claims arise under the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

5. This Court has authority to grant declaratory relief under 28 U.S.C. §§ 2201–2202, and to grant injunctive relief under Federal Rule of Civil Procedure 65 and the Court's inherent equitable powers.

6. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) and (b)(2) because all Defendants are subject to personal jurisdiction in the District of Puerto Rico, and a substantial part of the events giving rise to the claims occurred within this District.

### Younger Abstention Does Not Apply

6A. An active state appeal (TA2026AP00439) is pending at the time of filing. Younger v. Harris, 401 U.S. 37 (1971), and its progeny instruct federal courts to abstain from interfering with ongoing state judicial proceedings when: (1) state proceedings are active; (2) the proceedings implicate an important state interest; and (3) the state forum provides an adequate opportunity to raise the federal claims. Even assuming the first two conditions are satisfied, Younger abstention does not apply here for three independent reasons, each of which is sufficient standing alone.

**6B.** First, the bad faith and harassment exception applies. Middlesex County Ethics Committee v. Garden State Bar Ass'n, 457 U.S. 423 (1982). The state proceedings have not provided — and structurally cannot provide — a genuine opportunity for merits adjudication before the irreversible harm occurs. The documented facts establish this conclusion: the Moción de Desestimación y Oposición (Motion to Dismiss and Opposition) was filed in SUMAC (Sistema Unificado de Manejo y Administración de Casos — the Puerto Rico courts' unified case management system) three hours before the March 30 hearing without notification to Plaintiff, who received it after the hearing had already begun (¶35); the burden of presentation at the hearing was inverted, requiring Plaintiff to present first despite the respondent bearing the burden under the applicable procedural rules (¶36); the Court of Appeals disposed of the contemporaneous Motion in Aid of Jurisdiction the same day it was filed with the entry "nada que proveer" ("nothing to provide" — the court's entry) without substantive analysis (¶38); and the same pattern of same-day disposal without calendar inquiry was repeated across six successive filings in two courts over two months (¶¶42–43A). Taken together, these facts establish that the state proceedings have been conducted in a manner that structurally forecloses meaningful adjudication before the operative harm — the close of the 2026 admission cycle — becomes irreversible. This is not an isolated procedural error; it is a documented pattern across multiple judicial vehicles.

**6C.** Second, the inadequate forum exception applies. Sprint Communications, Inc. v. Jacobs, 571 U.S. 69 (2013). The state mandamus proceeding is structurally incapable of providing the full federal relief Plaintiff seeks. Three categories of relief available in this Court are unavailable in the state proceeding: (a) compensatory, nominal, and punitive damages against Defendants in their individual capacities under 42 U.S.C. § 1983 — a remedy that

does not exist in Puerto Rico mandamus proceedings; (b) declaratory relief under 28 U.S.C. §§ 2201–2202 establishing the constitutional violation as a matter of federal law; and (c) enforcement of UPR's obligations under the OCR Resolution Agreement (OCR Case No. 02-22-6004), a federal instrument executed under federal disability civil rights law and subject to active federal supervision, which Plaintiff invokes not as a disability claim but for the institutional principle it establishes: that UPR has accepted in writing, under binding federal obligation, that vendor technology failures do not excuse denial of access to its programs, and that UPR possesses and has formally committed to deploying the institutional mechanisms necessary to provide alternative access when a vendor's system creates a barrier for a specific individual. That principle applies directly to the barrier created here regardless of its origin in disability law. Enforcement of that federal commitment requires federal jurisdiction and cannot be obtained through state mandamus. Because the state forum is structurally unable to grant the complete federal relief sought, Younger abstention does not require this Court to defer to the state proceedings as to those claims. Sprint Communications, 571 U.S. at 77–78.

**6C-A.** That obligation under ABA Standards, including but not limited to Standard 501, is one of several federal conditions governing UPR Law's participation in Title IV federal student aid programs — programs for which UPR serves as a substantial custodian on behalf of the students and community it was created to serve. In academic year 2023–24, students across Puerto Rico received approximately $783.7 million in Federal Pell Grants alone (U.S. Department of Education, Federal Student Aid data, NAICU Puerto Rico Territory Summary 2023–24), and UPR Río Piedras disbursed federal grant aid to 74% of its undergraduate students, averaging approximately $5,852 per student annually (IPEDS /

College Factual, AY 2022–23). A public university that serves as custodian of federal funding on this scale accepts, with that responsibility, binding federal obligations — including non-discrimination and equitable access requirements under 34 C.F.R. Part 668, and UPR's own written commitments under the OCR Resolution Agreement (OCR Case No. 02-22-6004) that vendor technology failures do not excuse denial of access to its programs. These federal obligations operate alongside and in congruence with UPR's state institutional framework — including the Organic Law of the University of Puerto Rico — which the federal accreditation process reviewed and recognized as consistent with federal standards. The conduct challenged in this Complaint — sustained denial of evaluation to a qualified applicant through an ultra vires condition, defended at public expense — implicates those obligations directly.

**6D.**  Third, even if neither exception applied, the calendar of irreparability forecloses the abstention remedy. Younger abstention is an equitable doctrine; it does not apply where its operation would itself cause the irreparable harm the plaintiff seeks to prevent. The admission calendar for the 2026 cycle is controlled exclusively by the respondent institution and has not been disclosed in any proceeding (¶¶42–43A). The state merits appeal will not be resolved before the 2026 admission cycle closes. A stay of this federal action pending resolution of the state appeal would achieve UPR's objective without a merits ruling: August 2026 arrives, the cycle closes, and Plaintiff's claim becomes moot. Younger abstention was not designed to function as a mechanism by which a respondent institution can defeat a federal constitutional claim by controlling the operative deadline while the federal court waits. The irreparability documented in paragraphs 42 through 43A

and paragraph 61 is itself the reason abstention is inappropriate: any delay in federal adjudication, however brief, extinguishes the remedy entirely.

6E.    The three foregoing exceptions are each independently sufficient to defeat abstention. Separately, and in direct response to Defendants' invocation of res judicata in the state appellate proceedings (TA2026AP00439, Entry 7, filed May 8, 2026): the constitutional arguments set forth in this Complaint were raised in the state-court proceedings as contextual and background assertions only, and were expressly reserved for federal adjudication. The Commonwealth courts have not adjudicated, and under their own characterization of the proceedings cannot adjudicate, the constitutional dimensions of this dispute. That invocation — based on the certiorari denial in TA2026CE00392, a discretionary non-intervention under Regla 40 that adjudicated no constitutional question and stated no constitutional holding — confirms that no merits adjudication has occurred. The constitutional claims presented in this Complaint are therefore presented fresh for the first time in any forum competent to adjudicate them.

## III. PARTIES

7.    Plaintiff Dr. Amarilys Abreu Santana is a natural person and a citizen of the Commonwealth of Puerto Rico residing in Las Piedras, Puerto Rico. Plaintiff holds a Bachelor of Science in Industrial Engineering (five-year program) from the University of Puerto Rico at Mayagüez (UPRM), conferred magna cum laude, and three graduate degrees in law from European institutions: a Doctorate in Law (Ph.D.), a Master of Science in Law (M.Sc.), and a Master of Laws (LL.M.). She has over thirty years of professional experience across finance, technology, law, and regulatory fields. She is, and at all times relevant to this Complaint has been, an applicant to the J.D. program at UPR Law.

**8.** Defendant Erika Fontánez Torres is the current Dean of the University of Puerto Rico School of Law. She is sued in her official capacity for prospective injunctive and declaratory relief under the doctrine of Ex parte Young, 209 U.S. 123 (1908), as the present officeholder with institutional authority to remedy the conduct challenged in this Complaint. Pursuant to Federal Rule of Civil Procedure 25(d), any successor in the office of Dean is automatically substituted as a party Defendant in her official capacity for purposes of prospective relief. Defendant Fontánez Torres is also sued in her individual capacity for compensatory, nominal, and punitive damages arising from conduct committed under color of state law on and after the date of her assumption of office. On May 8, 2026 — the date on which Defendants' outside counsel filed the opposition in the state appellate proceedings (TA2026AP00439, Entry 7) — Defendant Fontánez Torres, through retained outside counsel financed with public funds, filed a 25-page opposition in which she: (a) adopted and ratified in full the ultra vires condition constructed by her predecessor, conditioning evaluation of Plaintiff's application on activation of a data transmission not required by UPR Law's published admission formula and expressly objected to in writing by Plaintiff; (b) invoked the doctrine of cosa juzgada based on a discretionary non-intervention order (TA2026CE00392) that adjudicated no constitutional question and stated no constitutional holding — a characterization that itself confirms no state forum has reached the constitutional merits; and (c) affirmatively sought the imposition of $1,500.00 in attorney's fees against Plaintiff on grounds of temeridad (recklessness/bad faith), seeking to financially penalize a pro se litigant for pursuing judicial review of the conduct challenged in this Complaint. Her adoption of the predecessor Dean's position was taken with actual knowledge that Plaintiff had raised

constitutional arguments in the state proceedings as contextual assertions only, expressly reserving them for separate adjudication. That adoption, combined with her deployment of the cosa juzgada defense based on a procedural non-intervention, and her affirmative pursuit of fee sanctions against a pro se litigant, constitute reckless or callous indifference to Plaintiff's federally protected rights within the meaning of Smith v. Wade, 461 U.S. 30 (1983), and independently support the punitive damages claim asserted against her.

9.  Defendant Vivian I. Neptune Rivera is the immediate former Dean of the University of Puerto Rico School of Law (tenure ending April 30, 2026). She is sued in her individual capacity for compensatory, nominal, and punitive damages arising from constitutional deprivations committed under color of state law during her tenure as Dean.

10. Defendants John/Jane Does 1–20 are individuals who, at any time during the conduct alleged or during the pendency of this action, hold or have held the following positions: members of the UPR School of Law Faculty Admissions Committee; members of the Junta de Gobierno (Board of Trustees) of the University of Puerto Rico; the President of the University of Puerto Rico; the Rector of the Río Piedras Campus; and other officials of UPR Law and the University of Puerto Rico with decision-making or supervisory authority over the conduct alleged. Each acted under color of state law, and each participated in, ratified, or — having actual or constructive knowledge of the underlying conduct and the institutional authority to remedy it — failed to take corrective action with respect to the conduct challenged in this Complaint, including (a) the refusal to apply UPR Law's published admission criteria to Plaintiff's application using the data already in the institution's possession; (b) the imposition of ultra vires conditions of evaluation requiring transmission of credential content that is not required by UPR Law's published admission

policy, not usable in the evaluation, not authorized by Plaintiff, and objected to by Plaintiff in writing — content that LSAC processed despite that objection; and (c) the authorization or ratification of the retention of outside counsel at public expense for the institutional defense of those conditions. Plaintiff is presently unable to identify all such individuals by name. Their identities will be ascertained through discovery, and Plaintiff will move to amend this Complaint to substitute their true names upon ascertainment. Each is sued in his or her individual capacity for compensatory, nominal, and punitive damages arising from constitutional deprivations committed under color of state law.

11.    In addition to the individual-capacity claims pleaded in paragraph 10 against the occupants of those offices, the President of the University of Puerto Rico and the Rector of the Río Piedras Campus are named as Defendants in their official capacities for prospective injunctive and declaratory relief under the doctrine of Ex parte Young, 209 U.S. 123 (1908). Pursuant to Federal Rule of Civil Procedure 25(d), any successor in those offices is automatically substituted as a party Defendant in his or her official capacity for the purposes of that prospective relief.

12.    The University of Puerto Rico is not named as a Defendant. Plaintiff acknowledges that the University, as an instrumentality of the Commonwealth, enjoys Eleventh Amendment immunity from suit in federal court for damages and retrospective relief, and that the Ex parte Young doctrine permits the relief sought in this action to be obtained through suit against the Dean in her official capacity.

## IV. FACTUAL ALLEGATIONS

### A. UPR Law's Published Admission Standard

13.  The University of Puerto Rico School of Law publishes its admission criteria for the Juris Doctor program. Under those published criteria, admission is governed by an objective numeric admission index calculated from two inputs: undergraduate grade-point average ("GPA") and Law School Admission Test ("LSAT") score. The published policy is available at https://derecho.uprrp.edu/futuros-estudiantes/admision/juris-doctor/.

14.  UPR Law's J.D. admissions process is institutionally distinct from the system-wide graduate admissions process administered by the Decanato de Estudios Graduados e Investigación at the Río Piedras Campus, whose own published manual governing graduate admissions expressly directs Juris Doctor and in-person LL.M. applicants to the School of Law itself, on the explicit ground that "las disposiciones y los trámites de dicha Escuela difieren de los expuestos en esta sección" ("the provisions and procedures of said School differ from those set forth in this section").

15.  The responsibility for the substantive content of UPR Law's admission policy rests on the law school as an institution. ABA Standard 501 provides: "A law school shall adopt, publish, and adhere to sound admission policies and practices consistent with the Standards, its mission, and the objectives of its program of legal education." Under that Standard, the published criteria — including the formula structure, the five categories of required materials, and the express designation of graduate transcripts as "preferible, pero opcional" (preferred, but optional) — are UPR Law's own institutional commitments. UPR Law may delegate the operational task of credential assembly to a third-party vendor such as LSAC, but it cannot delegate its Standard 501 obligation to adopt, publish, and adhere to those criteria. When the vendor's processing produces outcomes inconsistent with the published criteria — for example, treating as required content the policy designates as

"preferible, pero opcional" (preferred, but optional) — the institutional duty to adhere to the published criteria remains with UPR Law.

16.    UPR Law's published policy declares: "La admisión no es discrecional. En su lugar, la oferta de admisión se basa en un rango numérico" — admission is not discretionary; the offer of admission is based on a numerical range. The published policy specifies that the admission index is calculated by summing the percentile of undergraduate GPA and the percentile of LSAT score, with equal weight, and that the School does not require minimum LSAT or GPA scores. The Faculty Admissions Committee selects fifteen (15) additional students per cycle.

17.    Graduate transcripts are not weighted in the admission formula. UPR Law's published policy is express: "El envío de los expedientes en que hayas cursado estudios graduados es preferible, pero opcional" ("The submission of transcripts from graduate studies you have completed is preferred, but optional") — the submission of graduate-level transcripts is, by the institution's own published declaration, optional. UPR Law has further confirmed in the state-court record that graduate-record content is not an input to the admission formula.

18.    Plaintiff's computed admission index, calculated using UPR Law's own published formula and Plaintiff's verified GPA (3.91, magna cum laude) and LSAT score (151), exceeds the published median index of admitted students. Defendants offered no contrary computation in the state-court record.

## B. The Five Required Application Materials Are in UPR Law's Possession

19.    UPR Law's published admission requirements identify five categories of materials necessary to evaluate a J.D. application. As of the operative date of UPR Law's refusal, all

five categories of materials had been received by UPR Law in formats sufficient for evaluation under UPR Law's own published criteria.

20.    Plaintiff's official undergraduate transcript was transmitted directly by the Registrar of the University of Puerto Rico at Mayagüez (UPRM) to UPR Law on March 9, 2026. That mode of transmission satisfies the definition of "official transcript" set forth in ABA Interpretation 502-1, which provides that an official transcript is either "(1) a paper or electronic transcript certified by the issuing institution and delivered directly to the law school; or (2) a paper or electronic transcript verified by a third-party credential assembly service and delivered directly to the law school." Under the ABA's own published definition, the two channels are co-equal: a transcript delivered directly from the issuing institution is no less an "official transcript" than one routed through a credential assembly service.

21.    Plaintiff's LSAT score is, by operation of LSAC's own protocols, available to UPR Law upon a request that does not require Plaintiff to authorize any further processing of her graduate credentials.

22.    The remaining three categories of required materials — the resumé, the personal statement, and the academic essay (eight to fifteen pages) required by UPR Law's published criteria — were timely submitted by Plaintiff. UPR Law's published policy expressly states that the institution "no acepta ni toma en consideración cartas de recomendación. Tampoco ofrece entrevistas a los solicitantes. Ello sin excepción alguna." ("does not accept or consider letters of recommendation, does not offer interviews to applicants, without any exception whatsoever.")

## C. LSAC's Unauthorized Processing of Graduate Credentials

23. The Law School Admission Council ("LSAC") is a Pennsylvania nonprofit corporation that operates the Credential Assembly Service ("CAS"). LSAC is not a state actor and is not subject to Puerto Rico regulatory authority.

24. Plaintiff's graduate credentials — her LL.M., M.Sc., and Ph.D. transcripts — were on file with LSAC because other universities to which Plaintiff sought to apply required graduate credentials as part of their admission processes. Their presence in LSAC's systems was a function of those institutions' independent requirements and bore no relation to Plaintiff's UPR Law application. For her application to UPR Law specifically — where graduate transcripts are designated "preferible, pero opcional" (preferred, but optional) under UPR Law's published admission policy and are expressly excluded from the numeric admission formula — Plaintiff exercised the agency UPR's published policy itself recognizes and declined inclusion of her graduate credentials. Plaintiff so notified LSAC in writing on February 17, 2026, and on multiple subsequent occasions. LSAC nonetheless included those credentials in the CAS report destined for UPR Law and refused Plaintiff's requests to opt out — handling this data in ways inconsistent with Plaintiff's express written authorization and objections.

25. On February 21, 2026, LSAC formally denied Plaintiff's removal request in writing. UPR Law's own admissions office attempted to obtain the same removal on Plaintiff's behalf on March 5, 2026; that attempt was also unsuccessful, with UPR Law's office closing the matter without producing the underlying communication to Plaintiff. The combined effect of LSAC's unauthorized processing and its refusal to correct it was to render the standard CAS channel unusable for Plaintiff's application — through no fault of Plaintiff.

26.     The terms and conditions under which LSAC operates require, as a condition of CAS report transmission, that the applicant grant LSAC a license described as "irrevocable, perpetual, worldwide, and unrestricted" with respect to credentials in its custody. Authorizing transmission of Plaintiff's CAS report to UPR Law would therefore both (a) cause UPR Law to receive content processed without authorization and against her express written objection and (b) require Plaintiff to extinguish reserved legal rights against LSAC.

**D.  UPR Law's Demand and Its Admissions in the State-Court Record**

27.     Notwithstanding the receipt of all five categories of required materials and the availability of Plaintiff's substantive academic data, UPR Law has conditioned evaluation of Plaintiff's application — and Plaintiff's application alone among all applicants — on her authorization of a CAS transmission that necessarily includes credential content that is not required by the published admission formula, not usable in the evaluation, not authorized by Plaintiff, and expressly objected to by Plaintiff in writing. Plaintiff does not object to the CAS transmission as a mechanism; she objects to being compelled to authorize a transmission carrying data processed without her authorization and against her express written objection as the price of evaluation. Both LSAC and UPR Law received specific, good-faith requests to correct the record, remove the unauthorized content, and engage with constructive alternatives. Both refused — leaving Plaintiff without a good faith partner to resolve the matter. That joint recalcitrance is not coincidental: it directly benefits both institutions — preserving LSAC's position and protecting UPR Law's relationship with its vendor — at Plaintiff's expense.

28.     UPR Law's filings in the Commonwealth mandamus proceeding contain three admissions that are material to the federal claims pleaded herein and constitute admissions against

institutional interest. First, the Assistant Dean for Student Affairs of UPR Law, Mildred Meléndez Otero, Esq., has acknowledged in writing that Plaintiff's graduate records are not relevant to the published admission formula.

29. Second, UPR Law's Motion to Dismiss expressly characterized the submission of graduate-credential information as voluntary in the institution's own words. The Motion states that, with respect to graduate-credential information, applicants "si desean" (if they wish) — may include such information "como documento adjunto" (as an attached document) or send it to LSAC. The Motion's identification of "documento adjunto" as a path distinct from sending to LSAC necessarily refers to direct submission to UPR Law itself, thereby acknowledging in UPR Law's own words that direct transmission to the School is a valid transmission channel.

30. Third, and most damaging: the Assistant Dean for Student Affairs of UPR Law, Mildred Meléndez Otero, Esq., acknowledged in the state-court record that the institution could request that LSAC transmit only the undergraduate program records — thereby confirming both that the graduate-record content is unnecessary for evaluation and that the data flow could be modified. That acknowledgment, however, did not constitute a remedy. The offer conditioned Plaintiff's access to evaluation on the activation of a CAS transmission that would include her credential content processed without authorization and against her express written objection, and would extinguish the legal rights she had expressly reserved against LSAC for that same unauthorized processing — at the precise moment she was exercising them. UPR Law's proposed "solution" was not repair of the channel failure: it was the institutional laundering of LSAC's unauthorized processing. By conditioning access on Plaintiff's activation of the transmission, UPR Law would have converted

LSAC's unauthorized processing of Plaintiff's personal data into an authorized act, retroactively. The institution chose to protect LSAC's position over the rights of the applicant whose personal data LSAC had mishandled — and to use its own admission process as the instrument of that protection. LSAC rejected UPR Law's coordination request on March 5, 2026, as it had rejected Plaintiff's removal request on February 21, 2026. The three admissions stand: the graduate-record content is not an input to the formula, its submission is optional, and UPR Law's own proposed mechanism confirmed the data flow could be modified — but was deployed to coerce rather than to repair.

31. Notwithstanding those admissions, UPR Law continues to demand, as a unique condition of evaluation, that Plaintiff authorize transmission of credential content processed by LSAC without her authorization and against her express written objection and grant LSAC the irrevocable, perpetual, worldwide rights described in paragraph 26. No similarly situated J.D. applicant — that is, no applicant whose CAS-channel materials do not contain content processed without authorization and against her express written objection, and no applicant whose evaluation does not require the surrender of reserved legal rights against LSAC — is required to undertake those acts as a condition of evaluation. The condition imposed on Plaintiff is, on UPR Law's own admissions, neither a substantive input to the published formula nor a procedural step undertaken by similarly situated applicants. It is a condition unique to Plaintiff, unsupported by the published admission criteria, and ultra vires of UPR Law's own published policy.

32. The claim advanced by Defendant Neptune Rivera's state-court counsel — that the Dean lacks administrative authority over the admissions process — is directly contradicted by both the institutional definition of her role and her own prior exercise of that administrative

authority on multiple documented occasions. Under Section 37.3.1.1 of the Reglamento General (General Regulations) of the University of Puerto Rico, the Dean is the maximum executive authority of the School of Law. In 2017, she exercised that authority by redistributing UPR Law's daytime academic offerings following Hurricane María across the federal District Court, the Colegio de Ingenieros, and outdoor tented spaces, resuming classes on October 30, 2017, without affecting the institution's accreditation. In 2020, she exercised direct administrative authority over the admission process by announcing that UPR Law would accept applications without the EXADEP and would accept the LSAT-Flex following the cancellation of the in-person LSAT — demonstrating that when the standard channel of transmission fails, the Dean possesses and has exercised the authority to adapt the admission process accordingly. In 2024, she exercised that same administrative authority by facilitating the formal agreement between UPR and the Puerto Rico Department of Correction and Rehabilitation that UPR publicly announced as a "histórica admisión" (historic admission). Under the doctrine of *actos propios* (estoppel by one's own acts), Defendant Neptune Rivera's refusal to act here is not the absence of authority — it is non-compliance with the governance her position requires.

### E. The Sequence of State-Court Proceedings

33.    On March 27, 2026, Plaintiff, proceeding pro se, filed a Petition for Mandamus in the Court of First Instance, Superior Court of San Juan (Case No. SJ2026CV02312), seeking to compel evaluation of her application under the published admission formula. Plaintiff simultaneously moved for a Provisional Measure to preserve the status quo through the close of the 2026 admission cycle.

34. The trial court issued an order to show cause directing the Dean to demonstrate why the writ should not issue, and set an oral hearing for March 30, 2026, at 2:30 p.m. The order to show cause did not adjudicate the motion for Provisional Measure.

35. On March 30, 2026, retained outside counsel for the Defendants filed an eleven-page motion to dismiss and opposition through SUMAC at 11:22 a.m. — three hours before the 2:30 p.m. hearing. Plaintiff was not notified of that filing until 3:31 p.m. — one hour after the hearing had already begun. At the hearing, Plaintiff stated on the record that she had not had access to the motion; the trial court directed opposing counsel to send it to her and proceeded with the hearing nonetheless. The trial court signed and entered judgment the same day at 6:10 p.m. SUMAC notified Plaintiff of the opposition motion at 9:05 p.m. on March 30 — after the hearing had concluded and the judgment had already been signed. SUMAC notified Plaintiff of the judgment itself the following morning, March 31, 2026, at 9:24 a.m. — approximately fifteen hours after entry. The certificate of service of the motion nonetheless represented service "upon all parties of record." Plaintiff thus received formal notification of the dispositive filing only after the hearing had already begun, and was not notified of the judgment until the following day, with no opportunity at any point to respond to the new factual representations the motion introduced and the judgment adopted the same day.

36. At the March 30, 2026 hearing, the trial court inverted the burden articulated in its own order to show cause and required Plaintiff (the petitioner) to present first. The Dean did not appear. Plaintiff interpellated counsel for the Defendants directly on material factual points — including why the published numeric formula could not be applied to the two verified inputs already in UPR Law's possession (undergraduate GPA and LSAT score), and what

the operational contingency was when the standard CAS channel fails, among other points. Two University officials with direct knowledge of the admission process were present at the hearing but were not called to testify: Mildred Meléndez Otero, Esq., Assistant Dean for Student Affairs, and Yara I. Alma Bonilla, Esq., Admissions Coordinator and Student Support Advisor. Meléndez Otero, Esq. had personally confirmed in writing that graduate records are not an input to the published admission formula, and had direct institutional knowledge that the CAS coordination mechanism she had proposed had already been rejected by LSAC on two separate occasions — on February 21, 2026, in response to Plaintiff's own request, and on March 5, 2026, in response to a request placed by UPR Law's own admissions office. Her presence at the hearing without being called to testify on those specific points was therefore not a gap in available knowledge — it was a gap by institutional choice. None of those questions received an articulated response from counsel for the Defendants, and the trial court did not order any response, leaving those material factual questions unaddressed in the record on which judgment was entered.

37. On the same day, the trial court entered judgment denying the writ. The judgment did not adjudicate the unresolved Provisional Measure, did not address Plaintiff's federal Resolution Agreement arguments (OCR Case No. 02-22-6004), did not address the documented LSAC refusals, did not address the institutional normative framework — including the Organic Law of the University of Puerto Rico (Ley Núm. 1 of January 20, 1966), Ley Núm. 113-2025, and Reglamento Núm. 9653 — under which UPR's own consistently articulated policy is one of merit-based access and active removal of administrative barriers to qualified applicants, and did not address the declaration in UPR Law's own Manual de la Escuela de Derecho 2021-2022 — issued under Defendant

Neptune Rivera's signature as then-Dean — that access to justice begins with access to legal education.

38. Plaintiff filed a Petition for Certiorari with the Court of Appeals (TA2026CE00392) on March 31, 2026. Within four hours of filing, the Court of Appeals received the University's opposition and entered a resolution declining issuance of certiorari under Rule 40. The resolution's entire substantive analysis was confined to whether the trial court had abused its discretion: that the trial court's actions were the product of the adequate exercise of its discretionary authority, and that nothing suggested the trial court had erred or abused its discretion. The resolution contained no analysis of the OCR Resolution Agreement, the documented LSAC refusals, the unresolved Provisional Measure, the burden inversion at the March 30 hearing, or any of Plaintiff's procedural due-process arguments. Critically, the resolution itself acknowledged in its factual recitation that the deadline for submission of applications to the 2026 admission cycle was March 31, 2026 — the same day as the resolution — yet entered no preservation measure, directed no inquiry into the evaluation and adjudication calendar that would follow, and issued no order to maintain the status quo pending any further proceeding. The submission deadline was public; the evaluation calendar — when applications would be assessed, when admission offers would be extended, and when seats would become irrevocably committed — was not. A court aware that the submission deadline had passed had the clearest possible reason to inquire into the evaluation calendar before denying without preservation. It did not. None of Plaintiff's procedural due-process arguments was adjudicated.

39. On April 13, 2026, Plaintiff filed a 52-page Motion for Reconsideration of the March 30 judgment. The trial court disposed of that motion the same day with the entry "Nada que

disponer" ("nothing to dispose"), on the stated premise that the Court of Appeals' prior determination on Plaintiff's filing precluded the trial court from acting on the judgment. That premise was factually incorrect: the Court of Appeals' March 31, 2026 resolution had disposed only of an interlocutory certiorari (TA2026CE00392, Entry No. 4) — a procedurally distinct vehicle with its own object, deadlines, and standards — and was not an appeal of the final judgment. The Motion for Reconsideration of the final judgment was therefore never addressed on its merits in any forum. On April 14, 2026, Plaintiff filed a successive request for jurisdictional aid and preliminary injunction; the Court of Appeals disposed of that request the same day with the entry "Nada que proveer" — "nothing to provide."

40.    On April 29, 2026, Plaintiff filed a direct, as-of-right civil appeal of the underlying judgment (TA2026AP00439). The following day, April 30, 2026, marked the formal end of Defendant Neptune Rivera's tenure as Dean.

41.    Concurrently with the appeal, on April 29, 2026, Plaintiff filed two protective motions before the Court of Appeals. First, the appeal brief itself contemporaneously requested jurisdictional aid and an immediate stay of the 2026 admission cycle pending merits resolution, expressly binding any successor in office under Rule 22.4 of the Puerto Rico Rules of Civil Procedure. Second, Plaintiff filed a separate Motion for Peremptory Mandamus, asking the Court of Appeals to order the Dean (or the successor in office) to include Plaintiff's application in the 2026 evaluation cycle directly — without remand — on the grounds that the duty was clear, that the Defendants had had at least eight prior procedural opportunities to comply, and that no ordinary remedy remained adequate. On May 1, 2026, the Court of Appeals issued an order setting May 8, 2026, as the date for the

Defendants' response on the merits appeal, but did not act on either of Plaintiff's protective motions. As a functional matter, the failure to act on either motion — coupled with the entity controlling the admission calendar being itself the respondent — operates as a disposition adverse to Plaintiff: the Defendants are afforded time to respond, while Plaintiff is afforded none of the preservation she requested to keep the dispute live during that response window.

## F. Opacity of the Admission Calendar

42.     UPR Law has not made public, and has not disclosed in the state-court proceedings, the internal calendar by which the 2026 admission decisions are processed and finalized. The institution that controls when applications are evaluated, when admission offers are extended, when seats become irrevocably committed, and when discretionary slots close, is the same institution that is the respondent in the underlying mandamus action. Plaintiff raised the absence of calendar disclosure as a specific ground for relief in each of the following state-court filings: the original Mandamus petition of March 27, 2026, which requested the trial court to order Defendants to identify the operative deadline by which inclusion in the 2026 cycle would be feasible; the Petition for Certiorari and contemporaneous Motion in Aid of Jurisdiction filed before the Court of Appeals on March 31, 2026 (TA2026CE00392), which requested an order that the institution refrain from finalizing, closing, or certifying as complete the 2026 admission cycle in any manner that excluded Plaintiff's application — denied under Rule 40 with a substantive analysis confined to whether the trial court had abused its discretion; the Motion for Reconsideration of April 13, 2026, which documented that the judgment had been entered without any inquiry into the admission calendar; the Motion for Jurisdictional Aid and

Preliminary Injunction to Preserve the Status Quo Pending Appeal filed before the Court of Appeals on April 14, 2026 (TA2026CE00392) — whose title expressly identified calendar preservation as its object — disposed of the same day with the entry "Nada que proveer"; the appeal brief of April 29, 2026, which simultaneously requested a stay of the 2026 admission cycle precisely because the calendar was opaque and controlled by the respondent; and the separately filed Motion for Peremptory Mandamus of April 29, 2026, which identified the running calendar as one of the grounds requiring direct relief without remand. In none of those proceedings did any court order Defendants to disclose the operative calendar, direct any inquiry into it, or condition further proceedings on its disclosure. The calendar has continued to run, undisclosed and uninquired into, through each successive judicial disposition.

43. The combination of (a) refusal to evaluate Plaintiff's application through any channel other than the LSAC CAS, (b) opacity of the internal admission calendar, and (c) failure of state courts to act on contemporaneous jurisdictional and injunctive motions, has had the practical effect of foreclosing meaningful judicial relief. The judicial silence on the calendar issue is not incidental — it is the operative mechanism of that foreclosure. Each of the six filings identified in paragraph 42 raised the calendar as a threshold issue: without knowing when the cycle closes, no court can assess irreparability, no stay can be calibrated, and no remedy can be designed. The consistent failure to address that threshold issue across three successive judicial vehicles — trial court, certiorari, and merits appeal — has allowed the institution controlling the calendar to benefit from its own opacity. That structural dynamic — respondent controls the deadline, courts decline to inquire, calendar runs — is not a contingent feature of this litigation. It is the architecture of the denial.

**43A.**   The following table summarizes the six proceedings in which Plaintiff specifically raised the opacity of the admission calendar as a ground for relief, and the disposition each received. In no proceeding did any court order disclosure of the calendar, direct inquiry into it, or condition further proceedings on its disclosure.

| Date | Filing | Forum / Docket | Disposition |
|---|---|---|---|
| Mar 27, 2026 | Mandamus Petition and Motion for Provisional Measure | TPI — SJ2026CV02312 | Judgment entered same day; Provisional Measure never adjudicated; calendar not addressed |
| Mar 31, 2026 | Petition for Certiorari and Motion in Aid of Jurisdiction | TA — TA2026CE00392 | Denied under Rule 40 same day; substantive analysis confined to abuse of discretion; calendar not addressed |
| Apr 13, 2026 | Motion for Reconsideration (52 pp.) | TPI — SJ2026CV02312 | "Nada que disponer" same day; calendar not addressed |
| Apr 14, 2026 | Motion for Jurisdictional Aid and Preliminary Injunction to Preserve Status Quo Pending Appeal | TA — TA2026CE00392 | "Nada que proveer" same day; calendar not addressed |
| Apr 29, 2026 | Appeal Brief with Contemporaneous Stay Request | TA — TA2026AP00439 | Stay request pending; no action on calendar as of filing of this Complaint |
| Apr 29, 2026 | Motion for Peremptory Mandamus | TA — TA2026AP00439 | Pending; no action on calendar as of filing of this Complaint |

**43B.**   To the extent Defendants assert that closure of the 2026 admission cycle renders this action moot, that assertion fails on two independent grounds. First, voluntary cessation does not moot a claim. A defendant cannot manufacture mootness by completing the very act the plaintiff seeks to enjoin while litigation is pending, and bears the formidable burden of demonstrating that the challenged conduct cannot reasonably be expected to recur. *Friends of the Earth, Inc. v. Laidlaw Environmental Services, Inc.*, 528 U.S. 167, 190 (2000). The unauthorized content in Plaintiff's LSAC record remains uncorrected; the ultra vires condition imposed on Plaintiff has not been withdrawn; and nothing prevents UPR Law from applying the same condition to Plaintiff's application in any future cycle. A defendant

who closes the very cycle that is the object of the litigation while actively litigating to prevent the plaintiff's evaluation cannot invoke that closure as mootness — and cannot transfer to the plaintiff the consequences of the closure the defendant caused. The burden of reconstituting the specific opportunity lost falls on the party whose constitutional violation produced that loss. Second, Plaintiff's claims for compensatory, nominal, and punitive damages are entirely unaffected by the status of the 2026 cycle. Those claims arise from constitutional violations already committed and fully documented in the record, and survive regardless of whether injunctive relief remains available as to the 2026 cycle specifically.

## G. Comparator Track

44. Upon information and belief, formed after reasonable opportunity for further investigation and discovery, other applicants holding only undergraduate credentials and submitting through CAS have been processed routinely. No similarly situated applicant — that is, no applicant whose CAS-channel materials do not contain content processed without authorization and against her express written objection, and no applicant whose evaluation requires the surrender of reserved legal rights against the third-party credentialing entity — has been required, as a condition of evaluation, to authorize transmission of credential content that is not required by the published admission criteria, not usable in the evaluation, not authorized by Plaintiff, and objected to by Plaintiff in writing, or to grant a third-party credentialing entity an irrevocable, perpetual, worldwide license over such materials. Plaintiff alone has been required to undertake those acts.

## H. Structural Monopolies and the Absence of an Alternative Pathway

45.    The conduct challenged in this action operates against a backdrop of two intersecting institutional monopolies that, together, eliminate any meaningful alternative pathway by which Plaintiff could obtain the relief she seeks. The structural facts are these.

46.    First, LSAC operates a credentialing monopoly. The Credential Assembly Service is, in effect, the sole channel through which J.D. applications are processed for admission to virtually all American Bar Association-accredited law schools in the United States, the Commonwealth of Puerto Rico, and the common-law law schools of Canada. The condition complained of in this action — that authorization of the LSAC CAS transmission is required as a precondition to evaluation — is therefore not curable by Plaintiff applying elsewhere; every comparable alternative imposes the same gateway requirement. The monopoly position of LSAC means that the surrender of legal rights at issue here is not an isolated demand of UPR Law: it is the structural condition of access to legal education through the standard credentialing system.

47.    Second, UPR Law occupies a public-instrumentality monopoly. The University of Puerto Rico School of Law is the sole public law school in the Commonwealth of Puerto Rico. There is no alternative public legal-education provider to which Plaintiff could turn in the Commonwealth. The institutional gatekeeping at issue — control of the application pipeline, the admission calendar, and the criteria for evaluation — is exercised by the only public actor offering the relevant service in the jurisdiction.

48.    The intersection of these two monopolies — a private credentialing monopoly upstream and a public legal-education monopoly downstream — eliminates the conventional remedies of exit and substitution. The structural lock has four walls. First, LSAC — the credentialing entity that has already processed Plaintiff's graduate credentials without

authorization and against her express written objection and refused removal twice — gates every American Bar Association-accredited law school across the United States, the Commonwealth of Puerto Rico, and Canada. Second, UPR Law is the only public law school in the Commonwealth. Third, the two private alternatives in the Commonwealth (Pontificia Universidad Católica de Puerto Rico and Universidad Interamericana de Puerto Rico) are subject to the same upstream LSAC monopoly that has already created the harm to Plaintiff's record. Fourth, admission to the Puerto Rico bar is governed exclusively by the Reglamento del Tribunal Supremo de Puerto Rico, Regla 4.1.1(b), which requires a J.D. from an ABA-accredited law school and admits no alternative route. Plaintiff seeks to practice law in Puerto Rico; UPR Law is the only public institution in the Commonwealth that offers the required degree. As to bar admission in the United States, the alternative routes that exist in a small number of jurisdictions — including LLM-qualifying pathways — require an LLM from an ABA-accredited institution. Plaintiff's advanced law degrees are from European institutions and do not satisfy that requirement. No viable bar admission pathway exists for Plaintiff in Puerto Rico or in the United States absent completion of an ABA-accredited J.D. program.

49. The economic dimension of the structural lock compounds its irreparability. Tuition at UPR Law, as a public institution financed by all residents of Puerto Rico, is substantially lower than at either private alternative in the Commonwealth. Plaintiff, as the daughter of a veteran, is entitled under applicable Puerto Rico law to a fifty-percent tuition reduction at UPR — a benefit that does not apply at private institutions in the Commonwealth and cannot be replicated at any out-of-Commonwealth institution. Attendance at an out-of-Commonwealth law school would require Plaintiff to relocate from Puerto Rico, leaving

her home and family, and to bear the substantial additional costs of relocation and out-of-jurisdiction living that no damages award could retroactively undo. These are not abstract considerations of preference: they are concrete, individualized, and non-transferable features of the harm Defendants' conduct has caused and continues to cause. The suggestion that Plaintiff should pursue inferior or costlier alternatives also misapprehends the nature of the institution at issue. UPR is a public institution financed by the contributions of all residents of Puerto Rico — including Plaintiff. The officials who administer it hold authority that is delegated and fiduciary, not proprietary. They are custodians of public resources created to serve the community, not owners empowered to allocate those resources at will. They possess no authority to exclude arbitrarily a qualified applicant from the public benefit those resources exist to provide — particularly one who, by satisfying the published criteria through her own merit, has already earned the right to evaluation under those criteria.

50.    Plaintiff cannot transfer the harm by applying elsewhere, cannot reroute the harm by paying her way, and cannot self-remediate the harm through her own academic effort. Nor does the existence of marginal or inferior alternatives answer a constitutional deprivation: the law does not require the holder of a violated right to seek substitutes of lesser quality or greater burden as a condition of obtaining relief. The remedy for an unconstitutional condition is the removal of that condition — not a directive to find a harder path around it. Courts that deny access-to-courts and procedural due process claims typically rely on the existence of an alternative path for the plaintiff; no such path exists here. This Court's intervention is, for that reason, the only available source of relief.

## I. Absence of a Published Admissions Regulation

51.    Section 14.10.12 of the Reglamento General (General Regulations) of the University of Puerto Rico, Certificación Núm. 55 (2022-2023) of the Junta de Gobierno, authorizes the President of the University to prepare and submit, for approval by the Junta de Gobierno (Board of Trustees), a regulation governing the "Normas generales de ingreso al Sistema para los estudiantes" — the general norms of student admission to the System. The only regulation issued under that authority is Reglamento Núm. 9653 (Certificación Núm. 50, 2024-2025, of the Junta de Gobierno (Board of Trustees)), which by its express terms (Article V) governs admissions to undergraduate programs only. No regulation issued under Section 14.10.12 of the Reglamento General governs admissions to the Juris Doctor program at UPR Law, and Plaintiff is aware of no formal regulation, certification, or institutional policy document issued by the University, the Río Piedras Campus, or UPR Law that contains the operative criteria by which J.D. admissions are evaluated.

52.    The published manual of the Río Piedras Campus governing graduate admissions expressly disclaims jurisdiction over Juris Doctor admissions and directs applicants to UPR Law itself. UPR Law's own published Manual de la Escuela de Derecho 2021-2022, issued under the signature of Defendant Vivian I. Neptune Rivera as then-Dean — which on its first page declares that "el acceso a la justicia comienza con el acceso a la educación legal" (access to justice begins with access to legal education) — addresses post-admission academic norms and does not contain admissions criteria. UPR Law's official admissions webpage, located at the URL referenced in paragraph 13, is at the operative date of this Complaint a placeholder reading, in operative terms, "Visítanos pronto para obtener toda la información de tu Escuela de Derecho." The substantive admission criteria — including the numeric formula, the five categories of required materials, and the express disposition

that graduate transcripts are "preferible, pero opcional" (preferred, but optional) and that admission "no es discrecional" (is not discretionary) — are accessible only through dispersed and informal channels, including a Q&A page maintained on a Wix subdomain attributed to student activities of the School. Notwithstanding that absence of a formally published regulation, UPR Law has applied those criteria to Plaintiff's application as if they were mandatory, and has invoked them in support of its refusal to evaluate her application — without ever pointing to a regulation, certification, or institutional rule that contains them.

## J. Notification of Senior UPR Officials and Institutional Ratification

53.    On April 29, 2026, and April 30, 2026, Plaintiff served formal notification of the matters underlying this Complaint, by electronic mail with attached letter, upon the following senior officials of the University of Puerto Rico, each of whom holds institutional authority to direct or to remedy the conduct challenged in this action: (i) Dra. Zayira Jordán Conde, President of the University of Puerto Rico, notified on April 29, 2026, with copy to the Junta de Gobierno (Board of Trustees) of the University of Puerto Rico; (ii) Dra. Mayra Charriez, Rector of the Río Piedras Campus, notified on April 30, 2026; and (iii) Defendant Erika Fontánez Torres, Dean of the School of Law, notified on April 30, 2026 — the day before she assumed the role — ensuring that she had actual notice of the matters challenged in this Complaint before her first day in office. The notifications were not returned undelivered. The notifications were served on the holders of those institutional offices in their official capacities; the institutional ratification documented in paragraph 56 is attributable to the offices and continues with any successor occupants under Federal Rule of Civil Procedure 25(d).

54.   Notwithstanding that documented notification, no senior official of the University of Puerto Rico has taken corrective action with respect to the conduct challenged in this Complaint. The institutional response has continued without modification: UPR Law continues to demand, as a condition of evaluation imposed on Plaintiff alone, that Plaintiff authorize transmission of credential content that is not required by the published admission criteria, not usable in the evaluation, not authorized by Plaintiff, and objected to by Plaintiff in writing — and to grant LSAC the irrevocable, perpetual, worldwide rights described in paragraph 26; retained outside counsel Alfonso A. Orona Amilivia, Esq. and Ashley A. La Torre Navarro, Esq. continue to litigate that position at public expense; and the institutional defense in the state-court appellate proceedings has not changed. The retention of outside counsel and the maintenance of the litigation position were authorized by, ratified by, or undertaken with the knowledge of the senior officials named in paragraph 53.

55.   On May 3, 2026 — three days after the notification served on President Jordán Conde — President Jordán Conde, in a publicly reported meeting with the Governor of Puerto Rico, reaffirmed the institution's commitment to *"ampliar el acceso a la educación superior" ("to expand access to higher education")* and announced an Admisión Automática (Automatic Admission) policy directed to that end, while taking no action with respect to the institutional refusal to evaluate Plaintiff's application that had been brought to her direct attention three days earlier. That pattern of simultaneous public declaration and private inaction is not limited to the May 3 meeting. On April 30, 2026 — the same day Defendant Neptune Rivera stepped down as Dean, having maintained for two months the institutional position that blocked Plaintiff's application from being received — Neptune Rivera issued a farewell circular to the UPR Law community declaring that UPR is the "only institution

that fulfills its social role of receiving, forming, and graduating the students who come to its door." On May 1, 2026, the institution launched UPR Virtual, described by President Jordán Conde as a step to expand access to higher education — the same day Defendant Fontánez Torres assumed the Deanship without correcting the position blocking Plaintiff's application. Throughout April 2026, UPR's own institutional publication reported 9,200 students admitted and the Ley Núm. 113-2025 Admisión Automática (Automatic Admission) policy impacting 370 schools, under the campaign #SomosTuUniversidad (#WeAreYourUniversity) a sustained public narrative of open institutional access, maintained without interruption simultaneously with the institutional defense of Plaintiff's exclusion in the state-court record. Each official notified by Plaintiff possessed specific institutional authority to correct the conduct challenged in this Complaint: the President of the University of Puerto Rico holds authority over the use of public funds for outside counsel and over the issuance of corrective directives to UPR Law; the Rector of the Río Piedras Campus holds supervisory authority over the Decanato (Dean's Office) of the Law School under the Reglamento General (General Regulations) of the University of Puerto Rico; and Defendant Fontánez Torres, as Dean, holds direct authority to revoke the ultra vires condition imposed on Plaintiff requiring authorization of transmission of credential content that is not required by the published admission criteria, not usable in the evaluation, not authorized by Plaintiff, and objected to by Plaintiff in writing, and the surrender of reserved legal rights against LSAC. Each had actual notice. Each chose institutional ratification through inaction in the days following notification, while public funds continued to be expended through retained outside counsel Alfonso A. Orona Amilivia, Esq. and Ashley A. La Torre Navarro, Esq. to defend the position challenged in this

Complaint, in the state-court appellate proceedings that remain active and continuing through the date of this Complaint. The use of public funds to litigate the exclusion of a qualified applicant from a publicly-funded institution — against a person who, as a resident of Puerto Rico, has contributed to the funding of that institution — is not a neutral exercise of institutional authority.

55A.   This conduct did not occur in an institutional vacuum. During the same months in which Defendants maintained and litigated the position challenged in this Complaint, UPR was the subject of a widely reported institutional governance crisis: ten Academic Senates issued formal votes of no confidence in the University's President; students across multiple campuses initiated strikes and sustained protests over institutional governance failures; the Legislature of Puerto Rico proposed emergency legislation to restructure UPR's governance for five years, citing what its sponsors described as an unprecedented structural, recurrent, and multifactorial crisis; and the Fiscal Oversight Board conditioned funding on structural reforms precisely because UPR's own institutional checks had failed to self-correct. The pattern documented in this Complaint — senior officials using public institutional resources to defend a position that the institution's own published criteria, its own state-court admissions, and its own declared mission cannot support, while publicly proclaiming the opposite commitment — is not an isolated anomaly. It is a documented instance of the broader governance failure that Puerto Rico's own institutions, investigative press, and academic community were publicly identifying and protesting during the same period. The institutional checks that should have corrected the conduct challenged in this action demonstrably failed to do so. It is the deployment of a public trust against the interests of one of its intended beneficiaries. The institutional dysfunction documented in

the state-court record is not a matter of past conduct — it is ongoing and continues as of the date of this filing. As of the date of this filing, UPR is experiencing what the Legislature of Puerto Rico has described, in a proposed emergency law filed on May 5, 2026, as a "structural, recurring, and multifactorial crisis without precedent." The President of the University removed five of eleven campus rectors in March 2026 in a closed-door session not transmitted on the institution's public channel; student strikes spread across multiple campuses; and the Fiscal Oversight Board required a new fiscal plan in response to what the institution's own Governing Board publicly characterized as a structural deficit of approximately $700 million (Centro de Periodismo Investigativo, March 31, 2026). It is against this backdrop of institutional failure that UPR Law deployed outside counsel at public expense to defend an ultra vires condition against a pro se applicant. The convergence, in that defense, of institutionally opposed political factions reflects not political consensus but the transcendent institutional interest in protecting UPR's operational dependency on LSAC — an interest that overrides political differences and, in doing so, eliminates any rational basis for the condition imposed.

**55B.** The pattern of institutional opacity extends to compliance with Puerto Rico's transparency law. On April 8, 2026, Plaintiff submitted two requests under Ley Núm. 141-2019, as amended by Ley Núm. 156 of December 13, 2025 (the "Transparency Law"), seeking: (i) the official role description, authority, and governance documentation for the position of Dean of UPR Law School over J.D. admissions; and (ii) the contracts, engagement letters, and fee arrangements between the University and outside counsel Alfonso A. Orona Amilivia, Esq. and Ashley A. La Torre Navarro, Esq. in connection with this matter. The statutory response period of twenty (20) business days expired on May 6, 2026 without

response, resulting in silencio administrativo (constructive denial) under Article 7 of the Transparency Law. Under the 2025 amendment to the Transparency Law, an agency that fails to comply with a judicial order to disclose information is subject to fines of up to one hundred dollars ($100) per day. That UPR chose to ignore a lawful transparency request seeking documentation of the very authority it invoked against Plaintiff — while that same 2025 amendment was in full force — is not an oversight. It is an extension of the same institutional conduct this action challenges.

56.    On May 8, 2026 — the date on which Defendants' outside counsel filed the opposition in the state appellate proceedings (TA2026AP00439, Entry 7) — Defendants' outside counsel requested $1,500 in attorneys' fees against Plaintiff for temeridad (recklessness/bad faith), characterizing a pro se litigant pursuing judicial review of the conduct challenged in this Complaint as acting with "contumacia y desdén" (obstinacy and contempt). That request is the most recent act in the pattern of institutional conduct documented in this Complaint: a motion filed without notice three hours before hearing; a false certification of service; six judicial proceedings without merits adjudication; and now a fee demand against a pro se applicant. The pattern is not zealous advocacy. It is institutional retaliation financed with public funds, designed to exhaust rather than answer.

57.    The individual-capacity conduct of Defendant Fontánez Torres pleaded in paragraph 8 is further described here for context. Defendant Fontánez Torres assumed the Deanship on May 1, 2026, with a public academic profile that makes the conduct of May 8, 2026 particularly striking. Her published scholarship includes Derecho al Derecho: Intersticios y Grietas del Poder Judicial en Puerto Rico ("Right to Law: Interstices and Cracks in Judicial Power in Puerto Rico") (2012, co-authored with Hiram Meléndez Juarbe) — a

work that argues, in her own words, that the 'hyperjuridicification of the political sphere' forecloses critical citizen participation in the justice system. Her research adopts a socio-legal approach to land access, housing, and the relationship between law and political theory. She has served as pro bono counsel for environmental justice and social rights litigants, and received the 2014 Medalla Nilita Vientós Gastón from the Puerto Rico Bar Association for her trajectory in defense of human and civil rights. (Source: UPR Law School faculty profile; Princeton PLAS visiting fellowship profile, 2018.) On May 8, 2026 — her eighth day as Dean — Defendant Fontánez Torres authorized the filing of a formal appellate opposition (TA2026AP00439, Entry 7) that invokes procedural res judicata to foreclose adjudication of constitutional arguments raised in the state proceedings as contextual assertions only and expressly reserved for separate adjudication; requests $1,500 in attorneys' fees against a pro se litigant pursuing judicial review of the conduct challenged in this Complaint; and characterizes that applicant's documented claims as "rimbombancia" (bombast) and evidence of "contumacia y desdén" (obstinacy and contempt). The filing contains no reference to the institution's obligations under its Organic Law, its federal funding conditions, or its LPAU duties. The academic who published on the 'grietas' — the cracks — in judicial power has, on her eighth day in office, deployed that power to close the crack through which a qualified applicant sought federal constitutional remedy. That is not institutional inertia. It is a choice.

56. Throughout the period documented in this Complaint, Plaintiff has acted in good faith at every stage. Before filing any judicial proceeding, Plaintiff executed no fewer than six independent attempts to resolve the access barrier through informal channels — including direct written communications to the Dean, certified mail delivery of a complete

application package, engagement with the admissions office, a formal demand to LSAC's General Counsel, and two specific written proposals for alternative channel mechanisms. Each attempt was responded to not with resolution but with escalation: additional institutional resources were deployed, outside counsel was retained at public expense, and the litigation posture hardened with each successive proceeding. The asymmetry between the parties' conduct is documented in the record: Plaintiff absorbed the full burden of attempting informal resolution, proposed specific remedies at every stage to avoid litigation, appeared pro se across multiple judicial vehicles while bearing the costs of physical appearances and paper filings, and received in return a coordinated institutional defense financed by the public funds of the Commonwealth. Public officials exercising authority delegated to them by law do not fulfill their institutional role by winning through attrition — by imposing on a qualified applicant the cost of litigating a position that the institution's own published criteria, its own state-court admissions, and its own declared public mission cannot support. The conduct documented in this Complaint is not the exercise of legitimate institutional authority. It is its negation.

## V.  CLAIMS FOR RELIEF

### COUNT I — Procedural Due Process (Fourteenth Amendment, 42 U.S.C. § 1983)

42 U.S.C. § 1983 was enacted as part of the Civil Rights Act of 1871 — known as the Ku Klux Klan Act — in direct response to the failure of state institutions to protect individuals against state-sanctioned violations of constitutional rights. Congress designed § 1983 for precisely the circumstance presented here: an individual without institutional resources, facing a public institution with unlimited state resources, that deploys those resources to prevent the exercise of constitutional rights rather than to discharge the public duties for which those resources were entrusted. The provision exists because Congress understood,

**in 1871 and the courts have reaffirmed ever since, that when state institutions become instruments of constitutional violation rather than constitutional protection, the federal courts are the forum of last resort — and the first resort of the individual citizen who has no other place to go.**

57. Plaintiff repeats and realleges paragraphs 1 through 56 as if fully set forth herein.

58. UPR Law's published admission criteria — including the express declaration that admission is not discretionary, the specification of an objective numeric formula with equal weighting of LSAT and undergraduate GPA percentiles, and the identification of five categories of required materials — together create a constitutionally protected interest in having Plaintiff's application processed in accordance with those mandatory and explicit criteria. See Olim v. Wakinekona, 461 U.S. 238 (1983); Ky. Dep't of Corrs. v. Thompson, 490 U.S. 454 (1989).

59. The interest is procedural in character: it is the right not to be subjected to a material variation in the application process — including a coerced surrender of reserved legal rights as a condition of evaluation — that is not imposed on similarly situated applicants.

60. Defendants, acting under color of state law, have deprived Plaintiff of that protected interest by (i) refusing to evaluate Plaintiff's application on the basis of the data already in UPR Law's institutional possession or otherwise available — namely, Plaintiff's the two verified inputs to the published admission formula already described in paragraph 58; (ii) demanding, as a unique condition of evaluation, that Plaintiff authorize transmission of credential content that is not required by the published admission criteria, not usable in the evaluation, not authorized by Plaintiff, and objected to by Plaintiff in writing — and to grant LSAC the perpetual rights described in paragraph 26; (iii) doing so notwithstanding

UPR Law's own admissions, in the state-court record, that the graduate-record content is not an input to the published formula; (iv) doing so without notice or hearing on the differential treatment, and without articulating any reasoned basis for it; and (v) doing so on the basis of a demand that is itself ultra vires of UPR Law's own published policy.

61. Under the framework of Mathews v. Eldridge, 424 U.S. 319 (1976), the private interest at stake is not limited to the loss of a single academic year. It encompasses a set of irreplaceable, compounding, and structurally irreversible harms. First, the irrecoverable loss of Plaintiff's competitive position in the 2026 admission cycle specifically: her admission index places her at approximately the 95th percentile of likelihood of admission according to LSAC's own model, a position calculated against the specific pool of applicants in this cycle and not replicable with certainty in future cycles as the composition of the applicant pool changes. Second, the forced surrender of reserved legal rights against LSAC as a condition of evaluation. Third, the loss of the fifty-percent tuition benefit available to Plaintiff as a veteran's daughter at UPR — a public benefit that does not transfer to any alternative institution. Fourth, the costs of relocation and family separation that any out-of-Commonwealth alternative would impose. Fifth, the structural persistence of the LSAC channel failure, which remains uncorrected and will block Plaintiff's access to every ABA-accredited program in future cycles unless judicially remedied. Sixth, Plaintiff is 49 years of age, resides in a rural municipality in eastern Puerto Rico federally designated as an economically distressed community under the Tax Cuts and Jobs Act of 2017, and has ongoing family responsibilities — including economic support of and daily presence with an elderly parent in declining health — that are not transferable and not suspendable. Because the structural monopoly lock forecloses every alternative pathway,

these personal circumstances compound the irreparability of the harm: there is no substitute pathway, and the time lost is not recoverable. Beyond these individual harms, Plaintiff's exclusion damages the public interest in specialized legal formation. UPR Law's own published policy expressly provides fifteen discretionary admission slots for applicants whose profile — graduate credentials in a different discipline, professional experience, publications, and demonstrated aptitude for legal study — constitutes a valuable contribution to the student body. Plaintiff's profile fits that description precisely: she holds three graduate degrees in law, has over thirty years of professional experience across finance, technology, law, and regulatory fields, and her specialization in socio-legal research in public debt litigation is directly relevant to Puerto Rico's most pressing institutional and fiscal challenges. Her exclusion is a loss to the cohort, not only to herself. Plaintiff resides in a rural municipality in eastern Puerto Rico federally designated as an economically distressed community — one of the communities with the least access to legal services in the Commonwealth. Her formation as an attorney would represent direct, concrete access to justice for residents who have none today. That is precisely the public purpose for which UPR Law was created by the Legislature under Ley Núm. 1 of 1966 — to transmit knowledge in service of the Puerto Rican community, including those communities most in need of it. These harms also extend beyond what injunctive relief alone can restore. Defendants' sustained institutional obstruction has imposed on Plaintiff the burden of litigating pro se across multiple forums simultaneously over a period of months — consuming time and productive capacity, of documented economic value, that Plaintiff would otherwise have dedicated to professional and income-generating activity. To this must be added the emotional distress, health pressure, and dignitary harm of being

subjected to a coordinated institutional defense — financed by public funds — of a position that the institution's own criteria, admissions, and mission cannot support. These damages are causally attributable to Defendants' conduct specifically and compound with each month the institutional position is maintained. Against this weight of private and public harm, the high risk of erroneous deprivation under the procedure used, and the minimal additional governmental burden of evaluating Plaintiff's application on the basis of data already in UPR Law's possession, all weigh decisively in favor of constitutionally adequate process.

62. The LSAC CAS is the operational convention UPR Law elected as its transmission channel — it is not the admission process itself. UPR Law's published policy declares that graduate records are optional and not usable in the evaluation, but UPR Law failed to configure its elected channel to implement that policy option, allowing LSAC to process Plaintiff's graduate credentials without authorization and against her express written objection. When UPR Law designated the LSAC CAS as the exclusive channel for J.D. application transmission, it assumed the institutional responsibility to ensure that channel was operative for applicants. Where the channel fails — whether through the conduct of the vendor, through the institution's own refusal to provide an alternative when the vendor failed, or through both concurrently — the institution's duty requires it to seek repair of the channel failure or provide an alternative means of transmission and evaluate — not extinguish the process — without imposing coercive conditions inadmissible for a public agency. Critically, the duty to evaluate the application is independent of the operational channel: it subsists even when the standard channel is blocked, and would subsist if the LSAC CAS had never existed.

**62A.**  That institutional duty is grounded in at least three independent sources, spanning both the federal framework UPR voluntarily assumed and the state institutional framework through which it operates — frameworks that are congruent with and mutually reinforcing of each other. Under the federal framework: UPR Law's adoption-and-adherence obligations under ABA Standards, including but not limited to Standard 501 — compliance with which is a condition of the federal accreditation that enables UPR's participation in Title IV federal student aid programs under the Higher Education Act; and UPR's written commitment under the OCR Resolution Agreement (OCR Case No. 02-22-6004, executed December 15, 2022), a binding federal instrument establishing that vendor technology failures do not excuse denial of access to UPR's programs and that UPR has committed to deploying fallback procedures and alternative measures when a third-party provider's technology creates a barrier to access. Under the state framework, which the federal accreditation process reviewed and approved as congruent with federal standards: Articles 3(H)(20) and 3(H)(24) of the Organic Law of the University of Puerto Rico, establishing the institution's duty to maintain operative the technological and accreditation infrastructure through which it fulfills its public mission. Each source independently requires UPR Law to act when the standard channel fails. Together, across both frameworks, they are dispositive.

**62B.**  Plaintiff did not simply wait for a remedy. Through multiple written communications and in the state-court proceedings, she proposed specific alternative channel mechanisms — including evaluation on the basis of the materials already in UPR Law's possession and a good-faith conference within twenty-four hours to identify any remaining gap. Defendants neither evaluated those proposals on their merits nor identified what specific datum, if any, remained unsatisfied by the materials already delivered. At the March 30, 2026 hearing,

Plaintiff posed the question directly: what was the difficulty in applying the published arithmetic formula to the two verified numbers — undergraduate GPA and LSAT score — already in UPR Law's possession, and what was the operational contingency plan when the standard channel fails? Those questions, among others, received no articulated answer from Defendants' counsel, no response from the University officials present with direct knowledge of the admission process, and no order from the trial court directing one. Defendants' refusal to correct the channel failure, evaluate the proposed alternatives, or articulate what specific data point remained unsatisfied — and the imposition, instead, of coerced authorization as the only path forward — is volitional, not technical.

62C.   This sequence of affirmative institutional acts — failing to configure the channel, refusing repair, litigating to prevent evaluation, and closing every administrative alternative — constitutes state-created danger under Irish v. Fowler, 979 F.3d 65, 76–80 (1st Cir. 2020): government officials who take affirmative steps that create or substantially worsen a constitutional harm cannot shield themselves through qualified immunity.

62D.   The pattern of institutional non-disclosure throughout this record is independently probative. LSAC has never explained its refusal to remove credential content processed without authorization and against Plaintiff's express written objection — on two separate formal requests. UPR Law has never explained why CAS activation is the only available transmission mechanism when its own published policy declares graduate records optional. UPR Law has never disclosed what operational fallback exists when its elected vendor channel fails. UPR Law has never disclosed when the 2026 evaluation concludes or when admission slots fill — information entirely within its control. Each silence, standing alone, might be explained. Together, they constitute a pattern of systematic non-disclosure

supporting the adverse inference that the explanations, if given, would be adverse to Defendants on every material question: authority, capacity, cost, and calendar.

63. Plaintiff is entitled to declaratory and injunctive relief against Defendant Fontánez Torres in her official capacity, and to compensatory, nominal, and punitive damages against the individual-capacity Defendants, for the deprivation of her procedural due process rights. The conduct alleged herein — including the maintenance of the institutional position notwithstanding UPR Law's own state-court admission that graduate records are not an input to the published formula; the institutional refusal to deploy the fallback procedures and alternative measures committed to under the OCR Resolution Agreement; the imposition of a condition that is ultra vires of UPR Law's own published admission policy and unsupported by any regulation, certification, or institutional rule; the failure to adhere to UPR Law's adoption-and-adherence obligations under ABA Standards, including but not limited to Standard 501 — obligations grounded in the federal framework UPR voluntarily assumed as a condition of its participation in Title IV federal student aid programs; and the disregard of the institutional duties established by Articles 3(H)(20) and 3(H)(24) of the Organic Law of the University of Puerto Rico — duties that operate within and are congruent with that federal framework, as reviewed and confirmed by the federal accreditation process — manifests reckless or callous indifference to Plaintiff's federally protected rights, and warrants punitive damages under *Hope v. Pelzer, 536 U.S. 730, 741 (2002), and Smith v. Wade*, 461 U.S. 30 (1983). Defendant Neptune Rivera served as a tenured law professor for approximately two decades and as Dean of the only public law school in Puerto Rico for approximately fifteen years through April 30, 2026, and has been a member of the Comisión de Acceso a la Justicia (Access to Justice Commission) of the

Puerto Rico Supreme Court since 2014. By virtue of those positions and that tenure, she possessed actual knowledge of the constitutional standards governing institutional admission decisions, the procedural due process requirements applicable to deprivations of property and liberty interests, and the ABA Standards governing law school admission processes. Defendants John/Jane Does 1–20, each of whom held decision-making or supervisory authority over the conduct alleged and participated in or ratified it, similarly possessed actual or constructive knowledge of those standards. That the conduct alleged was undertaken notwithstanding actual knowledge of these constitutional and professional standards is a factor aggravating the assessment of punitive damages under *Smith v. Wade.*

63A.   The deterrence function of §1983 punitive damages is equally implicated. A public official who, armed with two decades of legal training, fifteen years of institutional leadership, and active membership on the Puerto Rico Supreme Court's Access to Justice Commission, maintains an ultra vires condition against a qualified applicant across multiple judicial proceedings — at public expense, while publicly proclaiming the opposite institutional commitment — sends a message to every public official in the Commonwealth that constitutional rights are litigable obstacles, not binding constraints. If that conduct carries no meaningful consequence, the deterrent value of §1983 is extinguished precisely where it is most needed: against the institutional official who knows the law and chooses to violate it anyway. The incompatibility between Defendant Neptune Rivera's conduct in this case and the public roles she has held and continues to hold is itself evidence of the deliberate character of the violation. The Comisión de Acceso a la Justicia (Access to Justice Commission) of the Puerto Rico Supreme Court exists precisely to ensure that individuals like Plaintiff — qualified, acting in good faith, seeking access to legal education as the

necessary first step toward participation in the legal system — are not structurally excluded by the conduct of the institutions that exist to serve them. Defendant Neptune Rivera has been a member of that Commission since 2014. She simultaneously maintained, for months, an institutional position that is the precise inversion of that mandate: using the resources of a public institution to block, across multiple courts, the access of a qualified applicant who had done everything the institution's own published criteria required. That a person holding that role could act in that manner — and that the institutional apparatus ratified and financed that conduct throughout — is not a failure of knowledge. It is a failure of will. Punitive damages in this action serve not only to compensate Plaintiff but to communicate that the constitutional rights of individuals who engage with public institutions in good faith are not negotiable by the institution's choice of how much it costs to litigate them, and that public roles premised on access to justice cannot be wielded as instruments of its denial.

**63B.** Under Ley Núm. 1 of January 20, 1966, as amended, the University of Puerto Rico's essential mission is to transmit knowledge in service of the Puerto Rican community — not to protect the commercial relationships of private vendors at the expense of the qualified residents it was created to serve. Defendants chose the incumbent market partner over the qualified resident the Legislature created this institution to serve — and did so against the most fundamental constitutional rights of qualified residents of the United States: the right to due process and equal protection of the laws under the Fourteenth Amendment. That choice, and that inversion of institutional purpose, is the subject of this action.

**COUNT II — Denial of Meaningful Access to the Courts (Fourteenth Amendment, 42 U.S.C. § 1983)**

64.    Plaintiff repeats and realleges paragraphs 1 through 56 as if fully set forth herein.

65.    The Constitution guarantees a right of meaningful access to the courts. Christopher v. Harbury, 536 U.S. 403 (2002). To state a claim for forward-looking denial of access, a plaintiff must identify (i) a nonfrivolous underlying claim, (ii) the official acts frustrating the litigation, and (iii) a remedy not otherwise available.

66.    Plaintiff's underlying mandamus claim is nonfrivolous: it rests on UPR Law's published declaration that admission is not discretionary, on a verified objective formula, and on the documented receipt of all five required categories of application materials.

67.    The official acts frustrating the litigation include (a) Defendants' refusal to disclose the internal admission calendar, depriving Plaintiff of the ability to obtain timely review before the close of the cycle; (b) the inversion of burden at the March 30, 2026 hearing; (c) the entry of judgment without adjudicating the contemporaneous Provisional Measure; (d) the appellate disposition of "nada que proveer" ("nothing to provide" — the court's entry disposing of the motion) entered the same day as the corresponding motion; and (e) the failure to act on Plaintiff's contemporaneous protective motions in the present appellate proceeding — both her request for jurisdictional aid and stay of the 2026 admission cycle, and her separately filed Motion for Peremptory Mandamus — while the calendar controlled by the Defendant institution continues to run.

68.    The pattern described in paragraph 67 has now been documented across five successive judicial dispositions. On March 30, 2026, the trial court entered Sentencia (judgment)

denying mandamus without adjudicating the contemporaneous Provisional Measure. On March 31, 2026, the Court of Appeals denied certiorari under Rule 40 with a substantive analysis confined to whether the trial court had abused its discretion and disposed of the contemporaneous Motion in Aid of Jurisdiction the same day with the entry "nada que proveer" ("nothing to provide" — the court's entry disposing of the motion). On April 13, 2026, Plaintiff filed a 52-page Motion for Reconsideration of the March 30 judgment; the trial court disposed of it the same day with the entry "Nada que disponer" ("nothing to dispose") — without any inquiry into the admission calendar and on the stated premise that the Court of Appeals' prior determination precluded action, a premise that was factually incorrect. On April 14, 2026, Plaintiff filed a request for jurisdictional aid and preliminary injunction before the Court of Appeals; the Court disposed of it the same day with the entry "Nada que proveer" — again without any inquiry into the calendar of irreparability. On May 1, 2026, the Court of Appeals issued an order in the merits appeal (TA2026AP00439) setting a response deadline of May 8, 2026 for the Defendants while taking no action on either Plaintiff's contemporaneous request for jurisdictional aid and stay of the 2026 admission cycle, or her separately filed Motion for Peremptory Mandamus. Each of those five dispositions shares a common structural feature: each addressed Defendants' procedural posture and was silent on Plaintiff's contemporaneous requests for protective relief tied to the calendar of irreparability. The repetition of that pattern across five successive judicial acts is the structural fact pleaded in this Count: the failure of meaningful access is not an isolated incident, and it is not curable through ordinary state-court process during the operative time horizon.

**69.** Plaintiff has no remedy otherwise available because the calendar controlled by Defendants is itself the operative time horizon: by the time merits review concludes through ordinary state-court channels, the academic year will be lost and the seat irrevocably committed. The structural monopolies described in paragraphs 45 through 48 — LSAC's credentialing monopoly over J.D. admissions throughout the United States, the Commonwealth of Puerto Rico, and Canada, on the one hand, and UPR Law's status as the sole public law school in the Commonwealth, on the other — eliminate any conventional pathway of substitution or exit and convert the unavailability of remedy from a contingent feature of the litigation calendar into a structural feature of the institutional architecture itself.

**70.** Plaintiff is entitled to declaratory and injunctive relief against Defendant Fontánez Torres in her official capacity, and to compensatory, nominal, and punitive damages against the individual-capacity Defendants, for the denial of meaningful access to the courts. The compensatory damages alleged in paragraph 61 are caused in part by the denial of meaningful access documented in this Count: the burden of litigating pro se across multiple forums simultaneously, the loss of earning capacity during that period, and the emotional distress and dignitary harm of being subjected to a sustained institutional defense that the state-court record demonstrates was not meaningfully reviewed on its merits. The conduct documented in this Count — maintaining a position that foreclosed effective judicial access across six filings in two forums, while the calendar of irreparability ran undisclosed and uninquired into — manifests the same reckless or callous indifference to Plaintiff's federally protected rights that warrants punitive damages under Smith v. Wade, 461 U.S. 30 (1983).

**COUNT III — Equal Protection (Fourteenth Amendment, 42 U.S.C. § 1983)**

71.   Plaintiff repeats and realleges paragraphs 1 through 56 as if fully set forth herein.

72.   Plaintiff is similarly situated to other J.D. applicants with respect to all material features of the published admission criteria, including the formula inputs (undergraduate GPA and LSAT score) and the CAS transmission channel through which applications are submitted. The defining feature of similarly situated applicants is that none has been required, as a condition of evaluation, to authorize transmission of credential content that is not required by the published admission criteria, not usable in the evaluation, not authorized by Plaintiff, and objected to by Plaintiff in writing, or to grant any third party an irrevocable, perpetual, worldwide license over such materials.

73.   Defendants have intentionally treated Plaintiff differently from those similarly situated applicants by demanding, as a condition of evaluation imposed on Plaintiff alone, the authorization of transmission of credential content that is not required by the published admission criteria, not usable in the evaluation, not authorized by Plaintiff, and objected to by Plaintiff in writing, and the surrender of reserved legal rights against LSAC. The differential treatment is intentional and is documented in UPR Law's own filings. The institutional public record independently establishes that intent: during the same period in which Defendants maintained and litigated the condition imposed on Plaintiff, UPR's senior leadership publicly and repeatedly declared the institution's mission as receiving every qualified applicant, removing administrative barriers to access, and expanding enrollment — including through Defendant Neptune Rivera's own farewell circular of April 30, 2026, declaring UPR the only institution that fulfills its social role of receiving, forming, and graduating the students who come to its door. An institution that publicly proclaimed the correct standard while simultaneously enforcing a contrary condition

against a single identified applicant cannot credibly characterize that departure as unintentional.

74. There is no rational basis for the differential treatment. Defendants' own admissions in the state-court record — that graduate records are not an input to the published formula, that the submission of graduate transcripts is *"preferable, but optional"* — preclude any rational justification for the singular condition imposed on Plaintiff. The data necessary to compute Plaintiff's admission index under the published formula are already in UPR Law's institutional possession or directly available without coerced authorization. The condition imposed on Plaintiff is, moreover, ultra vires of UPR Law's own published policy. The Organic Law of the University of Puerto Rico establishes merit-based access and service to the Puerto Rican community as the institution's essential mission, and Ley Núm. 113 of 2025 codifies as binding legislative policy that UPR must actively remove the administrative frictions that prevent qualified residents from accessing its programs. These instruments define the standard of non-discriminatory, non-arbitrary institutional conduct against which the condition imposed on Plaintiff must be measured: a condition that blocks merit-based evaluation of a qualified applicant, imposed on that applicant alone, directly inverts the institutional mandate that the Legislature has codified as public policy. A condition that the institution's own normative framework — statutory, regulatory, and published — identifies as contrary to its mission cannot satisfy rational basis review under any standard. The public institutional record forecloses any remaining justification: the same officials who maintained the challenged condition simultaneously declared, through official circulars, public campaigns, and published institutional reports, that UPR's mission is to receive every qualified applicant and remove every administrative barrier to access.

A condition that the institution's own senior leadership publicly characterized as contrary to institutional mission — during the very period of its enforcement against Plaintiff — cannot satisfy rational basis review. *See Vill. of Willowbrook v. Olech*, 528 U.S. 562 (2000) ("class of one" equal protection).

74A.  Defendants confirmed this admission a second time on May 8, 2026, in their formal appellate opposition before the Tribunal de Apelaciones (TA2026AP00439, Entry 7), voluntarily repeating that the workaround "se ha realizado en otras ocasiones" (has been performed on other occasions) for other applicants. The selective denial of that identical accommodation to Plaintiff, without explanation, is direct evidence of the irrational differential treatment the equal protection clause prohibits. That admission is significant in context. When the workaround was performed for other applicants, no comparable coercive condition was documented — no requirement to authorize transmission of credential content not required by the published formula, not authorized by the applicant, and against express written objection. Against Plaintiff alone, the same mechanism was conditioned on precisely that — and on the extinguishment of reserved legal rights against LSAC. That distinction — available for others without coercion, deployed against Plaintiff as a coercive condition — is itself evidence of discriminatory application.

75.  Plaintiff is entitled to declaratory and injunctive relief against Defendant Fontánez Torres in her official capacity, and to compensatory, nominal, and punitive damages against the individual-capacity Defendants, for the denial of equal protection of the laws. The aggravating-factor allegations pleaded in paragraph 63 — the actual knowledge of constitutional standards, procedural due process requirements, and ABA Standards possessed by Defendant Neptune Rivera and by the Doe Defendants — are incorporated

here and apply with equal force to the equal protection violations alleged in this Count. The conduct documented in this Count, including the imposition of a condition that the institution's own published criteria, state-court admissions, and declared mission cannot support, and its maintenance across multiple judicial proceedings at public expense while the institution publicly proclaimed the opposite commitment, warrants punitive damages on the standard articulated in *Smith v. Wade*, 461 U.S. 30 (1983).

## VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter judgment in her favor and against Defendants, and grant the following relief:

A.    A declaratory judgment under 28 U.S.C. §§ 2201–2202 declaring that Defendants' refusal to evaluate Plaintiff's J.D. application under the same published admission formula and through a non-coercive channel applied to similarly situated applicants violates the Due Process Clause and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution;

B.    A temporary restraining order and preliminary injunction pursuant to Federal Rule of Civil Procedure 65, on the terms set forth in Plaintiff's contemporaneously filed motion, preserving the status quo of the 2026 admission cycle and enjoining Defendant Fontánez Torres, the President of the University of Puerto Rico, and the Rector of the Río Piedras Campus, in their official capacities, together with their agents, employees, and successors in office, from finalizing 2026 admission decisions in a manner that would render Plaintiff's claim for relief moot;

C.    In the event the 2026 admission cycle has been closed as a consequence of Defendants' conduct during the pendency of this action, such make-whole relief as the Court deems necessary and appropriate to place Plaintiff in the position she would have occupied absent the constitutional violations documented herein — including but not limited to an order reconstituting for Plaintiff the specific admission opportunity of the 2026 cycle as it existed on March 17, 2026, on terms equivalent to those applicable to the 2026 entering class and at the tuition rate applicable to a resident daughter of a veteran — on the ground that any closure of the 2026 cycle that occurred while this action was pending and while Defendants were actively litigating to prevent Plaintiff's evaluation is itself a constitutional injury attributable solely to Defendants' conduct, the consequences of which Defendants, not Plaintiff, must bear. This Court should not sanction the proposition that Defendants may defeat a federal constitutional claim by running out the calendar they control while litigating in bad faith;

D.    A permanent injunction directing Defendant Fontánez Torres, the President of the University of Puerto Rico, and the Rector of the Río Piedras Campus, in their official capacities, together with their agents, employees, and successors in office, to evaluate Plaintiff's application under the same published non-discretionary admission formula and process applied to all other applicants in the 2026 admission cycle, on the basis of the data already in UPR Law's institutional possession or otherwise available without coerced authorization of credential content that is not required by the published admission criteria, not usable in the evaluation, not authorized by Plaintiff, and objected to by Plaintiff in writing;

E. Compensatory damages, in an amount to be determined at trial, against the individual-capacity Defendants, for procedural due process and equal protection violations committed under color of state law, including damages for lost professional opportunity and future earning capacity, loss of earning capacity during the period of Defendants' conduct, emotional distress, health-related harm, loss of productive life years, and dignitary harm caused by Defendants' sustained and deliberate conduct;

F. Punitive damages, in an amount to be determined at trial, against the individual-capacity Defendants, for procedural due process and equal protection violations manifesting reckless or callous indifference to Plaintiff's federally protected rights, under the standard articulated in *Smith v. Wade*, 461 U.S. 30 (1983);

G. Compensatory, nominal, and punitive damages, in amounts to be determined at trial, against the individual-capacity Defendants for denial of meaningful access to the courts, on the grounds set forth in Count II;

H. An award of attorney's fees and costs under 42 U.S.C. § 1988(b), to the extent permitted by law for a pro se litigant, and full reimbursement of taxable costs under 28 U.S.C. § 1920;

I. Such other and further relief, at law or in equity, as the Court deems just and proper.

## VII. DEMAND FOR JURY TRIAL

76. Plaintiff hereby demands a trial by jury under Federal Rule of Civil Procedure 38 on all issues so triable.

## VIII. VERIFICATION

*Verified Complaint — Abreu Santana v. Fontánez Torres et al.*

I, Amarilys Abreu Santana, declare under penalty of perjury under the laws of the United States of America, pursuant to 28 U.S.C. § 1746, that I have read the foregoing Complaint, that the factual allegations therein are true and correct of my own personal knowledge, except those alleged on information and belief, which I believe to be true.

Executed on this ⟨12⟩ day of May, 2026, in Las Piedras, Puerto Rico.

_____

Amarilys Abreu Santana, Ph.D.

_____

Respectfully submitted on this ⟨12⟩ day of May, 2026.

_____

AMARILYS ABREU SANTANA, Ph.D.

Plaintiff, Pro Se

HC-2 Box 7415

Las Piedras, P.R. 00771

Tel: 787-476-6715

Email: amarilys_a@hotmail.com